EXHIBIT A

## STATE OF VERMONT

**SUPERIOR COURT**                                    **CIVIL DIVISION**

**Chittenden Unit**                                      **Docket No.:**

| *Plaintiff(s)* | vs. | *Defendant(s)* |
|---|---|---|
| Diana Newton | | Kohl's, Inc. f/k/a Kohl's Dept. Stores, Inc. |

### SUMMONS

**THIS SUMMONS IS DIRECTED TO:**          **KOHL'S, INC.**

1. **YOU ARE BEING SUED.** The Plaintiff has started a lawsuit against you. The Plaintiff's Complaint against you is attached to this summons. Do not throw these papers away. They are official papers that affect your rights.

2. **YOU MUST REPLY WITHIN 21* DAYS TO PROTECT YOUR RIGHTS.** You must give or mail the Plaintiff **a written response** called an Answer within 21* days of the date on which you received this Summons. You must send a copy of your Answer to the Plaintiff's attorney, Gary L. Franklin located at:

   > **Primmer Piper Eggleston & Cramer PC**
   > **30 Main Street, P.O. Box 1489**
   > **Burlington, VT 05402-1489**
   > **Telephone: (802) 864-0880**

   You must also give or mail your Answer to the Court located at:

   > **Vermont Superior Court**
   > **Chittenden Civil Division**
   > **175 Main Street,**
   > **Burlington, VT 05402**

3. **YOU MUST RESPOND TO EACH CLAIM.** The Answer is your written response to the Plaintiff's Complaint. In your Answer you must state whether you agree or disagree with each paragraph of the Complaint. If you believe the Plaintiff should not be given everything asked for in the Complaint, you must say so in your Answer.

4. **YOU WILL LOSE YOUR CASE IF YOU DO NOT GIVE YOUR WRITTEN ANSWER TO THE COURT.** If you do not Answer within 21* days and file it with the Court, you will lose this case. You will not get to tell your side of the story, and the Court may decide against you and award the Plaintiff everything asked for in the complaint.

5. **YOU MUST MAKE ANY CLAIMS AGAINST THE PLAINTIFF IN YOUR REPLY.** Your Answer must state any related legal claims you have against the Plaintiff. Your claims against the Plaintiff are called Counterclaims. If you do not make your Counterclaims in writing in your Answer, you may not be able to

bring them up at all. Even if you have insurance and the insurance company will defend you, you must still file any Counterclaims you may have.

6. **LEGAL ASSISTANCE.** You may wish to get legal help from a lawyer. If you cannot afford a lawyer, you should ask the court clerk for information about places where you can get free legal help. **Even if you cannot get legal help, you must still give the Court a written Answer to protect your rights or you may lose the CASE.**

7. **NOTICE OF APPEARANCE FORM.** THE COURT NEEDS TO KNOW HOW TO REACH YOU SO THAT YOU WILL BE INFORMED OF ALL MATTERS RELATING TO YOUR CASE. If you have not hired an attorney and are representing yourself, in addition to filing the required answer it is important that you file the Notice of Appearance form attached to this summons, to give the court your name, mailing address and phone number (and email address, if you have one). You must also mail or deliver a copy of the form to the lawyer or party who sent you this paperwork, so that you will receive copies of anything else they file with the court.

*Gary L. Franklin*
Plaintiff's Attorney/Court Clerk

October 18, 2021
Dated

Served on: /0 | 9 2 /
Date

Sheriff

\* Use 21 days, except that in the exceptional situations where a different time is allowed by the court in which to answer, the different time should be inserted.

STATE OF VERMONT

SUPERIOR COURT                              CIVIL DIVISION
Chittenden Unit                             Docket No.:

DIANA NEWTON                    )
                                )
              Plaintiff         )
                                )    Civil Action No.:
      v.                        )
                                )
KOHL'S, INC., f/k/a KOHL'S      )
DEPARTMENT STORES, INC.         )
                                )
              Defendant         )

## COMPLAINT

Diana Newton, ("Diana" or "Plaintiff"), by and through her undersigned counsel, submits the following Complaint against Kohl's, Inc. f/k/a Kohl's Department Stores, Inc., ("Kohl's" or "Defendant") and states as follows:

### Nature of Action

1.     Kohl's fired Diana on May 12, 2021, immediately after she returned to work from a doctor's visit related to her disability and deteriorating health condition and less than one month after she had to take Family and Medical Leave Act ("FMLA")/Vermont Parental and Family Leave Act ("PFLA") leave for the same health condition and disability. After excelling in her role as a Kohl's Store Manager for more than seven and a half years, Kohl's terminated Diana's employment without a valid reason, in the middle of a pandemic, when Kohl's knew her health was deteriorating, both in retaliation to Diana's worker's compensation claim and her multiple complaints about sexual harassment and discrimination at Kohl's that were never properly investigated.

2.      Kohl's discriminated and retaliated against Diana by firing her on the basis of her: (1) sex; (2) age; (3) disability; (4) FMLA/PFLA leave; (5) workers' compensation claim; and, (6) complaints to Kohl's about its discrimination and retaliation.

3.      As a direct and foreseeable consequence of Kohl's unlawful actions, Diana has suffered, and continues to suffer, damages, including but not limited to: emotional and physical distress; lost back and front pay; lost benefits; damage to her personal relationships; costs; interest; and reasonable attorneys' fees.

## Parties

4.      Plaintiff Diana Newton is an individual residing in New Haven, Vermont.

5.      Defendant Kohl's, Inc. is a foreign corporation registered and authorized to do business in the State of Vermont and is formerly known as Kohl's Department Stores, Inc.

6.      Kohl's is a corporation organized under the laws of the State of Delaware and has a principal place of business located in Menomonee Falls, Wisconsin.

7.      Kohl's is a nationwide discount department store retailer which owns, operates, and maintains a department store generally located at 155 Dorset Street, South Burlington, Vermont 05403 (the "South Burlington Kohl's") and a department store generally located at 123 Berlin Mall Road, Berlin, Vermont 05602.

## Factual Allegations

8.      Kohl's operates a department store retail chain with locations in every state except for Hawaii.

9.      Kohl's is one of the largest department store chains in the United States with billions of dollars in retail sales a year.

10.     On or about October 31, 2013, Kohl's offered Diana a full time position as a Store Manager of the South Burlington Kohl's department store.

11.     In its offer letter, Kohl's promised to pay Diana an annualized salary of $85,000.00 once she completed her four week training period.

12.     As set forth in its offer letter, Kohl's also informed Diana that she was eligible to participate in Kohl's Team Bonus Plan, an annual team bonus based on total company performance that would pay her a bonus of 0% to 30% of her base salary, as well as Kohl's Personal Performance Inventive Plan, an incentive payment paid twice a year based on year to date personal performance.

13.     On November 1, 2013, Diana accepted the Store Manager position at the South Burlington Kohl's under the terms set forth Kohl's offer letter.

14.     At the time Kohl's offered her the Store Manager position, Diana had over seven years of experience as a manager at other retail department stores, a track record of successfully hiring, training and developing retail staff, and served on the board of directors for the Vermont Retail Association.

Diana's Supervisor and Positive Performance Evaluations

15.     Kohl's appoints a District Manager for various geographic regions and the District Manager is responsible for overseeing, managing, supervising and evaluating all Store Managers at each Kohl's location within the District Manager's geographic region.

16.     At some point, Kohl's appointed Dennis Miller to serve as the District Manager responsible for the South Burlington Kohl's location and he began to oversee, manage, supervise and evaluate Diana's performance as the Store Manager of the South Burlington Kohl's.

17.     Each year, Kohl's provided Diana an Annual Performance Review, evaluating her

performance as Store Manager, which was usually prepared by the District Manager responsible

for the South Burlington Kohl's.

18.     Throughout her employment, Diana consistently received very positive Annual

Performance Reviews from Kohl's, indicating that Diana was fully meeting or exceeding Kohl's

expectations for a Store Manager.  She also received annual bonuses based on her performance,

annual pay raises, and several merit awards.

19.     For example, in her 2018 Annual Performance Review, Diana's District Manager,

Dennis Miller, rated her as consistently exceeding Kohl's expectation for a Store Manager.  In

particular, Mr. Miller explained that:

> Diana has a deep understanding of the strengths and opportunities of her team.  She
> knows [how] to motivate them and assigns roles/tasks based on the associate's
> individual talents.  This skill is very helpful when dealing with some of the staffing
> challenges the store faces on a regular basis. . . Diana communicates effectively
> with her DM and informs him of any situation in the store. . . Diana is a very
> effective trainer.  This has been very helpful in the past few months when Diana
> has been a point person for [the] Berlin store, whose SM is out on a MLOA.

20.     In her 2019 Annual Performance Review, Diana's District Manager, Dennis Miller,

rated her as fully meeting Kohl's expectation for a Store Manager.  In particular, Mr. Miller

explained that:

> Diana and her team have a strong understanding that operations is the foundation
> of [] a successful store. . . Diana is a strong merchant and has elevated the
> presentation standards in her store.  She has worked very closely with the entire
> team to ensure merchandising directive are being set on time and to the company
> standard. . . Diana is a great partner [to] her DM.  She regularly shared information
> and ideas with the team.  Diana continues to develop the ASMs.  The 03 has become
> a much more effective leader in the past year due to Diana's coaching.

21.     In her 2020 Annual Performance Review, Diana's new District Manager, Laurie

Southey ("DM Southey"), who replaced Dennis Miller as the District Manager, rated Diana as

fully meeting Kohl's expectation for a Store Manager.  In particular, DM Southey rated Diana's

behavior as a Store Manager as consistently exceeding Kohl's expectations and explained that:

> Diana does a nice job running [store] #711, her team is strong operationally and
> they do a great job of completing all workload on a limited staff even though they
> are a very hard to hire store.   Diana did a great job this year working as a mentor
> with Kyle in [store] #1565. . . [and was] very helpful in bringing [her]
> merchandising talent/knowledge to the team there as well as assisting Kyle through
> some of his people challenges. . . I look forward to all that Diana will continue to
> bring to NEN in 2021.

Diana's Injury and Workers' Compensation Claim

22.      On or about January 16, 2018, Diana filed a workers' compensation claim due to a

shoulder injury she received while working at the South Burlington Kohl's.

23.      Diana took a leave, using vacation time, and was awarded temporary total disability

benefits from January 16, 2018 until January 30, 2018 for surgery to treat her shoulder injury.

24.      Diana was subsequently awarded permanent partial disability workers'

compensation benefits starting on January 31, 2018.

25.      Kohl's initially disputed Diana's award of permanent partial disability workers'

compensation benefits, but eventually agreed to pay Diana a Permanent Partial Disability Award

in July of 2019.

26.      On or about September 26, 2019, Kohl's paid Diana $78,996.15 as a Permanent

Partial Disability Award for her workers' compensation claim related to the shoulder injury she

received while working at the South Burlington Kohl's.

27.      Prior to September 26, 2019, Diana always received very positive performance

evaluations.  In fact, during her six years as a Store Manager up until September 26, 2019, Kohl's

never disciplined or criticized Diana's performance or behavior.

28.     After Diana received her Permanent Partial Disability Award from Kohl's, Kohl's behavior towards Diana suddenly changed in a negative manner.

The Start of Kohl's Discrimination and Retaliation Against Diana

29.     Less than three months after Kohl's paid Diana a Permanent Partial Disability Award in the amount of $78,996.15, Kohl's issued Diana a Written Warning dated December 10, 2019 (the "First Written Warning").

30.     In the First Written Warning dated December 10, 2019, Kohl's informed Diana that "[i]t was brought to Management's attention on August 21, 2019 that Diana created an uncomfortable work environment while in the South Burlington location." Kohl's further informed Diana that she "made inappropriate comments during an investigation. Her lack of judgment lead to a perception of discrimination and created an uncomfortable work environment." (emphasis added).

31.     Although Kohl's alleged that Diana violated certain policies in her First Written Warning, Kohl's failed to provide Diana with *any* details regarding her alleged conduct that violated the policies and also failed to explain how her conduct violated those policies.

32.     Kohl's prepared Diana's First Written Warning without conducting a proper investigation, as required under Kohl's employment policies, without making any determination as to whether Diana's conduct was in fact discriminatory (in contrast to creating *a perception* of discrimination), and without any explanation of how her behavior created an uncomfortable work environment.

33.     Upon information and belief, Kohl's issued Diana the First Written Warning in retaliation for having to pay her Permanent Partial Disability Award in the amount of $78,996.15. There is no other good faith explanation for Kohl's decision to wait *three* months after the alleged

incident to issue her the First Written Warning, particularly in light of the fact that the First Written Warning is entirely inconsistent with Diana's positive Annual Performance Reviews.

Kohl's Hires a New Loss Prevention Supervisor Who Harasses Diana, Ignores Diana's Complaints, and Amplifies its Discrimination and Retaliation Against Diana.

34.     On or about September 29, 2020, Kohl's hired a new Loss Prevention Supervisor, Jakob Oliver ("LP Ollie"), to work in the South Burlington Kohl's.

35.     At Kohl's, Loss Prevention Supervisors are in charge of creating and implementing theft prevention and shortage control programs for each Kohl's store.

36.     Loss Prevention Supervisors at Kohl's report to a District Loss Prevention Manager ("DLPM").

37.     At the time LP Ollie began at Kohl's, his DLPM was Jaclyn Tenanes ("DLPM Tenanes")

38.     Upon information and belief, Kohl's failed to properly train LP Ollie when he began, in part, because DLPM Tenanes terminated the employee that was going to train LP Ollie just before he started at Kohl's and, in part, due to the Covid-19 pandemic.

39.     LP Ollie is a male, former Marine that is 6'5 and has an imposing presence due to his size.

40.     On or about November 9, 2020, LP Ollie entered Diana's office in the South Burlington Kohl's when she was alone and became very agitated and defensive about Diana submitting a report when he was out of the office. LP Ollie continued to raise his voice and get angrier and Diana became concerned that he was losing his temper and she would not be able to calm him. Because Diana was scared of LP Ollie losing his temper, she made up an excuse to leave her office, saying she had to go to the bathroom. When Diana left her office, she noticed she was shaking because she was so upset, scared and intimidated.

41.     On November 9, 2020, Diana sent a text message to her immediate supervisor, DM Southey, describing how LP Ollie made her feel unsafe at work.  Diana further explained that "[h]ad it been reversed and I spoke to him the way he did to me the very least that would happen would be an investigation and a write up.  I know you don't have time for this . . . but threatening behavior and integrity issues are not acceptable in my opinion."

42.     On or about November 9, 2020, Diana reported to DLPM Tenanes and her immediate supervisor, DM Southey, how LP Ollie entered her office alone, yelled at her, lost his temper and was so angry that Diana felt unsafe, intimidated and was shaking after she left her office.

43.     In response, DLPM Tenanes informed Diana that she notified "associate relations" ("AR") – the term Kohl's uses for a part of its human resources department – and she instructed Diana to minimize her interactions with LP Ollie until directed otherwise by AR.

44.     AR never contacted Diana to conduct an investigation or to discuss LP Ollie's acts and never contacted any witnesses.

45.     Upon information and belief, Kohl's never conducted a proper investigation into LP Ollie's mistreatment of Diana on, or about, November 9, 2020 and never appropriately disciplined him for his conduct that made a colleague, Diana, fear for her safety.

46.     Although LP Ollie eventually apologized to Diana, his behavior did not change. He continued to make Diana and other employees at the South Burlington Kohl's feel uncomfortable and unsafe.

47.     On December 23, 2020, when DM Southey was visiting the South Burlington Kohl's, Diana informed her that LP Ollie still made her feel uncomfortable.  Diana explained that LP Ollie would only speak to her alone, in a small office, that LP Ollie sent her inappropriate text

messages that made her feel like he was stalking her, that LP Ollie was watching the store's surveillance cameras to spy on Diana to find times when she was alone so that he could approach her, and that she felt like his strange behavior was due to some sort of mommy crush.

48.     In response, DM Southey instructed Diana to minimize her interaction with LP Ollie, the same instruction she received from DLPM Tenanes. Thereafter, Diana tried to minimize how often she would need to interact with LP Ollie.

49.     Upon information and belief, DM Southey never reported LP Ollie's harassment and conduct to AR, or anyone else in Kohl's human resources department, and Kohl's did not otherwise investigate Diana's complaint to DM Southey on December 23, 2020.

50.     On December 30, 2020, LP Ollie emailed Diana and DLPM Steven Rodi ("DLPM Rodi"), who replaced DLPM Tenanes as LP Ollie's supervisor, to inform them that he intended to seek alternative employment because he overheard a conversation that he misconstrued to be about him.

51.     At some point, in late December 2020 or early January 2021, LP Ollie commenced his own investigation into Diana and reported her to DLPM Rodi because he falsely alleged that Diana was drunk at work, was behaving erratically and was having an inappropriate relationship with her Assistant Store Manager ("ASM").

52.     On or about January 4, 2021, Diana received an email from one of her employees, Patricia Tomlins, reporting that LP Ollie asked to speak with her in his office. LP Ollie alleged that other employees approached him about problems with Diana's behavior and informed Ms. Tomlins that he wanted her opinion. Ms. Tomlins informed Diana that LP Ollie's questioning made her feel very uncomfortable.

53.     Diana forwarded Ms. Tomlins' email to DM Southey on or about January 4, 2021.

54.     On or about January 6, 2021, Diana received an email from another one of her employees, Lindsay Gilbeau, who informed her that on December 30, 2020, LP Ollie asked to speak with her in his office.  LP Ollie asked Ms. Gilbeau whether she thought Diana was having an inappropriate relationship with her ASM and showed Ms. Gilbeau a photo on his cell phone that he took of a monitor from a South Burlington Kohl's surveillance camera that he alleged showed Diana holding hands with her ASM.  LP Ollie also claimed other employees reported to him that Diana was acting intoxicated at work.  Ms. Gilbeau informed Diana that the photo did not show her holding hands with her ASM, but that Diana was clearly walking in front of the ASM in the photo.

55.     Diana forwarded Ms. Gilbeau's email to DM Southey on or about January 6, 2021.

56.     On January 6, 2021, Diana once against spoke to DM Southey to report that she was not comfortable at work because she thought LP Ollie was following her and spying on her and her conversations.  DM Southey informed Diana she would speak to DLPM Rodi, but she never followed up with Diana and LP Ollie's harassment of Diana continued to get worse.

57.     On or about January 8, 2021, Ms. Gilbeau emailed Diana again, informing her that LP Ollie confronted her after she arrived at work to complain that Diana reported LP Ollie's improper investigation of her to DM Southey.  Ms. Gilbeau further reported that she continued to feel uneasy and uncomfortable in the presence of LP Ollie.

58.     Diana forwarded Ms. Gilbeau's email to DM Southey on or about January 8, 2021.

59.     On or about January 21, 2021, Diana emailed Andrea Martin, an AR advisor at Kohl's, to report that LP Ollie was not following Kohl's Covid-19 protocols because he was not getting health checks.  Diana also reported that LP Ollie was also harassing her, retaliating against

her, and conducting an investigation into her that violated Kohl's employment policies and made

her and other employees uncomfortable.

60.     Ms. Martin sent an email response to Diana the next day.  Ms. Martin's response

only addressed LP Ollie's failure to get Covid-19 health checks and did not mention or reference

LP Ollie's harassment, retaliation or his inappropriate investigation that violated Kohl's policies.

61.     On or about February 1, 2021, there was a shooting at the University Mall in South

Burlington, where the South Burlington Kohl's is located.

62.     On February 7, 2021, that same week, a random person entered the South

Burlington Kohl's before the store opened, at a time when the doors were supposed to be locked.

Diana tried to determine how the individual got into the store, which was supposed to be secure,

to make sure her employees were safe, particularly in light of the recent shooting.  Because she

had previously been asked to enter the loss prevention office and review camera footage, Diana

decided to enter the loss prevention office to review surveillance camera footage that might shed

light on how this person got into the store when the doors were supposed to be locked.

63.     When she reviewed the footage, Diana discovered that loss prevention's

surveillance cameras at the South Burlington Kohl's were not covering the front door, the same

week there was a shooting at the mall. So, Diana moved one of surveillance cameras back to cover

the front door, where it was supposed to be positioned.

64.     On February 8, 2021, the Vice President of AR, Lou Bellassai Jr. ("AR VP

Bellassai"), scheduled an interview with Diana, DM Southey, DLPM Rodi, and another AR

representative.  Prior to the meeting, Diana was not told what would be discussed.  During this

meeting, AR VP Bellassai falsely accused Diana of being responsible for various problems at the

South Burlington Kohl's, including, but not limited to:

a.  First, AR VP Bellassai blamed Diana for Kohl's losing 3 Loss Prevention Supervisors and a DLPM and accused Diana of being too involved with loss prevention. AR VP Bellassai based his accusation on information he received from LP Ollie, after he announced that he was resigning. According to AR VP Bellassai, LP Ollie felt harassed and like he was working in a hostile work environment. He also expressed concern that LP Ollie would sue Kohl's and subpoena its records.

b.  Second, AR VP Bellassai accused Diana of improperly entering the loss prevention office and deleting surveillance video relating to three theft cases. Diana explained that she entered the loss prevention office on February 7th to try to figure out how a random person entered the South Burlington Kohl's before it was open and when the doors were supposed to be locked, just after a shooting at the mall. Diana further explained that she discovered a surveillance camera that normally covered the front door was not positioned to cover the front door, so she moved it back to cover the front door. Diana also explained that she had absolutely no idea how to delete video.

c.  Third, after appearing to accept Diana's explanation, AR VP Bellassai brought up incidents that allegedly occurred in 2019, claiming there were many reports that Diana was discriminating against employees and creating an uncomfortable work environment. Diana was surprised to hear this, because Kohl's never previously mentioned these alleged reports and the allegations were belied by her positive Annual Performance Reviews. Although AR VP Bellassai admitted he didn't know the details of the reports or whether the reports were accurate, he still claimed they were evidence of Diana's inappropriate behaviors.

d.  Fourth, AR VP Bellassai accused Diana of rubbing the shoulders of the Loss
Prevention Supervisor that worked at the Burlington Kohl's prior to LP Ollie, even
though the Loss Prevention Supervisor left Kohl's several months earlier and
Kohl's never previously mentioned this incident to Diana.  Diana strongly denied
the accusation and informed AR VP Bellassai that she never touched any employee.

e.  Fifth, AR VP Bellassai accused Diana of ignoring LP Ollie because LP Ollie
complained, after he announced his resignation, that Diana and her staff ignored
him.  Diana responded that she was never intentionally rude and would always
respond to him, but she also stated that both her supervisor, DM Southey, and LP
Ollie's supervisor, DLPM Tenanes, instructed her to minimize her interactions with
LP Ollie on at least two separate occasions in response to her complaints about LP
Ollie's conduct.

65.    On February 11, 2021, Diana did not work because she was out sick and Diana had
scheduled days off from February 12th through February 14th.

66.    On February 15, 2021, Diana returned to work and had a second meeting with AR
VP Bellassai, DM Southey, and another AR representative.  Diana once again explained what
happened on February 7, 2021, why she entered the loss prevention office and why she moved the
surveillance camera back to properly cover the front door.

67.    At the end of the meeting on February 15, 2021, AR VP Bellassai suspended
Diana's employment on the grounds that she entered the loss prevention office and moved a
surveillance camera, reviewed video footage to determine how someone entered the South
Burlington Kohl's when the doors were locked, and allegedly deleted surveillance video that was
needed for three active investigations.

68.    Diana tried to object during the meeting, but every time Diana tried to explain that LP Ollie was retaliating against her and that Kohl's needed to conduct an investigation by speaking to other employees at the South Burlington Kohl's, AR VP Bellassai cut her off.

69.    At the end of the meeting, Kohl's suspended Diana's employment starting February 16, 2021.

70.    On February 15, 2021, Diana sent an email to the CEO of Kohl's, AR VP Bellassai, DLPM Rodi, DM Southey and others to inform them that she had been involved in an investigation that was combative, rather than truth seeking.  Diana further explained:

   a.  That the tone, posture, and declarative nature of the investigation would have been dramatically different if she was a male;

   b.  She was suspended before Kohl's even interviewed any of the employees at the South Burlington Kohl's;

   c.  She felt her career was threatened due to the biased investigation conducted by AR VP Bellassai;

   d.  Kohl's should commission a third party review of its investigation into her because it was not consistent with Kohl's core values, business practices, and employment policies;

   e.  That the complaints that led Kohl's to investigate and suspend her were unfounded, false and made in retaliation against her by LP Ollie, which he made only *after* he announced his intent to resign;

   f.  That DLPM Rodi and AR VP Bellassai contorted the evidence against her and lied about what happened;

g. That she spoke to DM Southey and asked why Kohl's never investigated her complaints about LP Ollie's harassment of her and her employees or his improper investigation into her behavior;

h. That AR VP Bellassai's investigation and threats to end her employment caused her an insurmountable amount of anxiety and stress; and,

i. That Kohl's was depriving her of an opportunity to respond to the allegations against her by prohibiting her from discussing the investigation with her employees at the South Burlington Kohl's, who would provide exonerating evidence.

71.    Diana received no response to her email dated February 15, 2021.

72.    On February 16, 2021, Diana sent another email to the CEO of Kohl's, AR VP Bellassai, DLPM Rodi, DM Southey and others, to serve as her statement in response to AR VP Bellassai's investigation. In her email, Diana explained that:

a. AR VP Bellassai's investigation was biased, hostile and dismissive and that he cut her off and would not allow her to finish speaking;

b. That she received permission to enter the loss prevention office from the prior DLPM and that Kohl's IT should have a way to determine when the videos were actually deleted;

c. That only one Loss Prevention Supervisor, other than LP Ollie left, not three, and that she had a great relationship with the previous DLPM, a woman;

d. That AR VP Bellassai's investigation was based on reports he received from LP Ollie, after he already announced his intent to resign, and the reports were retaliatory;

e.  That LP Ollie came into her office on November 9, 2020 and exploded on her, which scared her so badly she thought he would hit her, but Kohl's never conducted an investigation and never disciplined LP Ollie;

f.  That LP Ollie conducted an improper investigation into her, in violation of Kohl's employment policies, by interviewing female employees alone in a small office, making them feel uncomfortable and uneasy, where he falsely accused Diana of being intoxicated at work and having an inappropriate relationship with her ASM;

g.  That DLPM Rodi gave inaccurate and false information to AR VP Bellassai because she was a female employee; and,

h.  That AR VP Bellassai already made up his mind before conducting any investigation and repeatedly accused Diana of lying or being dishonest.

73.    At some point, Jolene Christensen, Kohl's VP of Human Resources, contacted Diana to set up a time to talk in response to her February 16, 2021 email referenced in the preceding paragraph.

74.    On February 19, 2021, Diana emailed Ms. Christensen, Kohl's VP of Human Resources, to complain about problems with AR VP Bellassai's investigation into her and how she made multiple complaints and reports to DM Southey and DLPM Tenanes regarding LP Ollie's retaliation and harassment of her, and other female employees, which Kohl's never properly handled or addressed.

75.    On February 22, 2021, Ms. Christensen responded to Diana, offering to speak with her, but Kohl's never sufficiently looked into or investigated Diana's concerns.

76.    On or about February 24, 2021, Diana had a meeting with Ms. Christensen, Miranda Gajewski, an AR employee at Kohl's, and DM Southey.  During the meeting, Ms. Christensen

informed Diana that her suspension was being lifted and she could go back to work as the Store Manager at the South Burlington Kohl's. Ms. Christensen further advised Diana that her past with Loss Prevention Associates was concerning and that Diana needed to work with loss prevention in a positive way.

77.     On February 25, 2021, Diana received a Second Written Warning from Kohl's, which was purportedly because Diana "exhibited an ongoing pattern of behavior that violates company policy, creates a negative work environment, and is inconsistent with the trust, leadership, and team-building roles and other responsibilities of a store manager."

78.     The Second Written Warning, like the First Written Warning, never identified a single example of Diana's behavior that violated company policy.  Instead, it contained vague, general and non-specific allegations that Diana mocked or disregarded concerns brought forward by other employees, interfered with loss prevention and permitted her employees to "inappropriately treat other associates, such as ignoring them while in the store", notwithstanding the fact that DM Southey and DLPM Tenanes specifically instructed Diana and her colleagues to avoid interacting with LP Ollie on multiple occasions.

79.     Notably, none of the issues set forth in the Second Written Warning are consistent with Diana's 2020 Annual Performance Review, which Kohl's provided to Diana on March 17, 2021, less than three weeks after the Second Written Warning.  Moreover, in Diana's 2020 Annual Performance Review, DM Southey rated Diana's behavior as consistently exceeding Kohl's expectations for a Store Manager.

80.     On or about March 11, 2021, Diana communicated with Miranda Gajewski, an AR employee at Kohl's, to discuss her concerns with Kohl's investigation into her and with Kohl's failure to take any action in response to her repeated complaints about LP Ollie's harassment.

Diana also requested additional training so that she could address any issues identified in her Second Written Warning.

81.     Ms. Gajewski thanked Diana for reaching out and taking Kohl's concerns seriously, but never offered any additional training and she never addressed Diana's other concerns.

82.     On April 6, 2021, Diana called out sick.

83.     Diana was out on leave due to her illness from April 6, 2021 until April 25, 2021.

84.     On April 13, 2021, Diana's physician sent Kohl's a "Concurrent Disability and Leave Statement of Incapacity" form, which put Kohl's on notice that Diana had a disability and was incapacitated between April 10, 2021 and April 26, 2021. Diana's physician further informed Kohl's that she was "not cleared to return to work and [was] unable to do any work due to [abdominal] pain, diarrhea and fatigue" and that Diana was diagnosed with a Cryptosporidium infection.

85.     Diana submitted a request for and was granted Federal Family and Medical Leave Act ("FMLA")/Vermont Parental and Family Leave Act ("PFLA") leave from April 6, 2021 until April 25, 2021.

86.     On April 26, 2021, the day Diana returned from her FMLA/PFLA leave, she was working at the South Burlington Kohl's when an individual appeared to be walking out of the store with cart full of unpaid merchandise. Diana approached the customer and tried to direct her to a cash register. The customer became agitated and began throwing shoes at Diana.

87.     During a similar incident in 2021 or 2020, Kohl's instructed Diana to handle such incidents by standing between the customer and exit, which is what Diana attempted to do on April 26, 2021, when she returned from FMLA/PFLA leave.

88.     On May 10, 2021, DM Southey asked Diana for a statement regarding the incident that occurred on April 26, 2021. In her email, Diana explained that she asked the customer if she could help her and the customer declined. The last time Diana asked, the customer explained she needed to find the registers and Diana walked with the customer toward the registers. When Diana approached the registers, she noticed the customer was walking around the registers towards the exit. Diana walked in between the customer and the exit doors and put her hand on the customer's cart, letting the customer know that she was bringing her to the registers and would need to get prices for the shoes in her cart because they were not in their boxes. Diana reached in to grab shoes to start getting prices to ring the customer up, and, as she did, she felt the customer's shoulder touch her. The customer grabbed the remaining shoes, cussed at Diana and walked towards Diana. Diana turned around and the customer threw shoes at her and left the store.

89.     On May 11, 2021, Diana informed DM Southey that she had a doctor's appointment on May 12, 2021 because she was getting a CAT scan since she still had severe pelvic pain and was nauseas, symptoms related to the disability and illness that required her to take FMLA/PFLA leave from April 6 until April 25, 2021 just a few weeks prior.

90.     At no point after she returned from FMLA/PFLA leave on April 26, 2021 did Kohl's make any effort to determine whether Diana needed any accommodations for her disability.

91.     On May 12, 2021, just as she was returning from her doctor's appoint, DM Southey informed Diana that she had to call AR VP Bellassai. During the call, AR VP Bellassai terminated Diana's employment and read Diana her termination notice.

92.     Kohl's termination notice explained that "Diana's employment is terminated due to an ongoing pattern of unacceptable behavior and violations of company policy." Kohl's once again vaguely alleged Diana "exhibited an ongoing pattern of behavior that is unacceptable,

violates company policy, and is inconsistent with the responsibilities of a store manage", without providing any details or examples of such "ongoing pattern of behaviors." Instead, the only incident identified in Diana's termination notice was the incident with a customer on April 26, 2021, the day she returned from FMLA/PFLA leave.

93.     Kohl's termination notice relied on an "ongoing pattern of behavior that is unacceptable", notwithstanding the fact that *just two months earlier* Diana's manager, DM Southey, rated Diana's behavior as consistently exceeding Kohl's expectations for a Store Manager in her 2020 Annual Performance Review.

94.     The only explanation for the two clearly inconsistent assessments is that Kohl's stated reasons for terminating Diana's employment were pretextual.

95.     After working as a Store Manager for Kohl's for more than seven and a half years, Kohl's terminated Diana's employment without a valid reason, in the middle of a pandemic, right when Diana's health was deteriorating due to her disability, shortly after Diana made multiple complaints to Kohl's about sexual harassment, discrimination and retaliation, and only after Kohl's paid Diana a workers' compensation settlement award.

96.     Kohl's pretextual termination of Diana's employment caused her significant amounts of emotional pain and suffering, mental anguish, loss of capacity for the enjoyment of life, and stress, as she was the sole breadwinner for her family.

97.     On May 17, 2021, Diana had a doctor's appointment related to her disability and the health condition that caused her to need FMLA/PFLA leave the month earlier.

98.     On May 23, 2021, Diana had emergency surgery to have her ovaries removed related to her health condition and disability.

99.    Diana's disability and health condition have not resolved and the loss of her job has only exacerbated her condition, stress and anxiety.

100.    Diana has received medical treatment for the stress and anxiety caused by Kohl's retaliatory and discriminatory acts set forth above.

## CAUSES OF ACTION

### COUNT I:
### Workers' Compensation Discrimination/Retaliation
### (21 V.S.A. § 710)

101.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

102.    Diana engaged in a protected activity by filing a workers' compensation claim for a shoulder injury she suffered while working at the South Burlington Kohl's that required surgery.

103.    Kohl's was aware that Diana filed a workers' compensation claim, was represented by counsel in Diana's workers' compensation proceedings and paid Diana a Permanent Partial Disability Award, as a result of her workers' compensation claim, in the amount of $78,996.15, on September 26, 2019.

104.    Diana suffered adverse employment actions as a result of filing a workers' compensation claim and receiving a Permanent Partial Disability Award from Kohl's, including, but not limited to, written warnings, suspension and termination of her employment.

105.    There is a causal connection between Diana's protected activity and Kohl's adverse employment actions/decisions, which began on December 6, 2019, just over two months after Kohl's paid Diana's Permanent Partial Disability Award on September 26, 2019.

106.    As a direct result of Kohl's retaliation and discrimination against Diana for filing a workers' compensation claim and receiving a Permanent Partial Disability Award, Diana has suffered damages for which she seeks compensation.

## COUNT II:
### Age Discrimination - Vermont Fair Employment Practices Act ("FEPA")
### (21 V.S.A. §§ 495, *et seq.*)

107.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

108.    Kohl's is an employer under the Vermont FEPA because it is an organization doing business in or operating within Vermont, pursuant to 21 V.S.A. §495d(1).

109.    Diana is a member of a protected class under the Vermont FEPA because she is at least forty (40) years of age.

110.    Diana was qualified and was satisfactorily performing her job as a Store Manager at the South Burlington Kohl's, as set forth in the positive Annual Performance Reviews that Kohl's provided her. Indeed, since it first hired Diana in 2013, Kohl's repeatedly gave Diana additional responsibilities and performance-based bonuses.

111.    Notwithstanding the fact that Kohl's repeatedly informed Diana that she was meeting or exceeding its performance expectations for Store Managers, Kohl's terminated Diana's employment on May 12, 2021.

112.    Upon information belief, Kohl's replaced Diana with a new, younger Store Manager who made less money and was less expensive to insure than Diana, demonstrating a continued need for Diana's services and skill.

113.    Upon information and belief, Kohl's also replaced other Store Managers, District Managers and DLPMs that were older than forty (40) years old with younger employees that were cheaper to employ and less experienced.

114.    Kohl's stated reason for Diana's termination, her "ongoing pattern of behavior that is unacceptable", was pretextual.  Kohl's reason for terminating Diana was belied by her 2020 Annual Performance Review, in which DM Southey rated Diana's behavior as a Store Manager to be consistently exceeding Kohl's expectations, just two months before her termination.

115.    As a direct and proximate result of Kohl's discriminatory termination of Diana based on her age, Diana has suffered damages for which she seeks compensation.

**COUNT III:**
**Gender-Based Discrimination - Vermont FEPA**
**(21 V.S.A. §§ 495, et seq.)**

116.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

117.    Kohl's is an employer under the Vermont FEPA because it is an organization doing business in or operating within Vermont, pursuant to 21 V.S.A. § 495d(1).

118.    Diana is a member of a protected class under 21 V.S.A. § 495 because she is a woman.

119.    Diana was qualified and was satisfactorily performing her job as a Store Manager at the South Burlington Kohl's, as set forth in the positive Annual Performance Reviews that Kohl's provided her.

120.    In Diana's 2020 Annual Performance Review, Kohl's informed Diana that she was fully meeting Kohl's expectations as a Store Manager overall and that she was consistently exceeding Kohl's expectations with regard to her "behaviors rating."

121.    Diana suffered adverse employment actions, including but not limited to, being given written warnings, being suspended, and being terminated on May 12, 2021.

122.    The circumstances surrounding Kohl's adverse employment actions give rise to an inference of discrimination on the basis of Diana's gender, which include, but are not limited to the following factual circumstances:

a.  Kohl's purported basis for terminating Diana's employment on May 12, 2021 was her behavior; however, less than two months earlier, on March 17, 2021, Kohl's informed Diana that she was consistently exceeding its expectations with regard to her "behaviors rating" in her 2020 Annual Performance Review;

b.  Kohl's immediately replaced Diana with a male Store Manager;

c.  Kohl's began taking adverse employment actions immediately *after* Diana complained to her boss and human resources that a male loss prevention associate was harassing her and other female employees, making them feel intimidated, uncomfortable and threatened;

d.  Kohl's failed to comply with its own harassment policy and failed to conduct a proper investigation of LP Ollie's sexual harassment, even though Diana repeatedly complained to her boss, HR and Kohl's management about his sexual harassment;

e.  Kohl's permitted the male loss prevention associate, LP Ollie, to conduct a harassing and improper investigation into Diana on the unfounded allegation that she had an inappropriate sexual relationship with the ASM, even though Kohl's employment policies did not permit loss prevention to conduct such investigations; moreover, LP Ollie had no training to conduct such

investigations and repeatedly violated Kohl's policies by interviewing female employees about Diana alone, in closed door settings, without another investigator of the opposite sex;

f.  At the same time Kohl's ignored and minimized Diana's complaints that the male loss prevention associate sexually harassed her and other female employees, making them feel threatened and uncomfortable, Kohl's vigorously and aggressively investigated LP Ollie's unfounded allegation that Diana appeared intoxicated and was having an affair with the ASM, giving rise to an inference that Kohl's treated spurious complaints from a male employee more seriously than detailed and repeated complaints from female employees;

g.  Kohl's terminated Diana's employment less than two months after she emailed the CEO of Kohl's to inform her: (i) that loss prevention conducted her investigation in an aggressive tone, posture and declarative nature on the basis of her gender, because she was a female, (ii) that the investigation would have been completely different and less aggressive if she was a male, and (iii) that loss prevention took improper actions against her during the investigation by permitting the male loss prevention associate to aggressively question her, as well as other female employees, in a small office alone, in violation of Kohl's policies; and,

h.  Kohl's suspended Diana's employment less than two months after she notified her direct supervisor that LP Ollie was stalking her by: (i) yelling at her alone in her small office in an aggressive manner that made Diana fear for her safety, (ii) using store video cameras to inappropriately monitor her to see when she

was alone at work; and, (iii) sending Diana inappropriate text messages outside of business hours, which Diana told her supervisor made her feel as though the male loss prevention associate had "some weird type of mommy crush"; notably, Kohl's failed to investigate LP Ollie's sexual harassment.

123.    As a direct and proximate result of Kohl's gender-based discrimination, Diana has suffered damages for which she seeks compensation.

**COUNT IV:**
**Gender-Based Retaliation - Vermont FEPA**
**(21 V.S.A. § 495(a)(8))**

124.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

125.    Diana engaged in protected activities under the Vermont FEPA when she complained about unlawful gender discrimination and retaliation at Kohl's on multiple occasions, including but not limited to:

    a.  Complaining to the DLPM and DM Southey in November of 2020 that (i) she felt her safety was at risk after LP Ollie lost his temper and yelled at her in her office in an aggressive, angry manner that scared Diana, (ii) Kohl's failed to investigate her complaints about LP Ollie's threating conduct and, instead, the DLPM simply advised Diana to minimize her interactions with LP Ollie, and (iii) she believed that if she spoke to a male employee in the same manner as LP Ollie spoke to her, Kohl's would have conducted an investigation and disciplined her;

    b.  Complaining to DM Southey in December of 2020 that LP Ollie still made her feel uncomfortable, would only speak to her alone in her small office, appeared to be using Kohl's video surveillance system to monitor her in the store, and was sending

26

her inappropriate text messages outside of work hours that made her feel as if he were stalking her and had a weird crush on her.   DM Southey did not properly investigate Diana's complaints and once again advised Diana to stay away from LP Ollie;

c.  Forwarding complaints to her supervisor from other female employees, that LP Ollie made them feel uncomfortable and uneasy, in December, 2020 and January, 2021.   These complaints occurred after LP Ollie conducted an inappropriate investigation of Diana by separately questioning each of the female employees alone in a small room about Diana, falsely accusing her of being intoxicated and having a sexual relationship with the ASM, in violation of Kohl's employment policies.   Kohl's did not further investigate these complaints;

d.  Complaining to DM Southey in January, 2021, that LP Ollie was following her and spying on her and her conversations.   DM Southey responded that she would speak with the DLPM about LP Ollie's behavior, but LP Ollie was never properly investigated or disciplined;

e.  Complaining to human resources that LP Ollie was not following Kohl's Covid-19 screening policies and was still harassing her and her ASM in January, 2021.   The human resources department ignored Diana's complaint about his harassment and only responded to her complaint about LP Ollie's violations of Kohl's Covid-19 screening protocols;

f.  Complaining to Kohl's CEO, and other members of Kohl's human resources department, via email dated February 15, 2021, that: (i) Kohl's conducted an investigation of her, after LP Ollie retaliated against Diana by complaining to his

boss that Diana was harassing him, and that the investigation was conducted in an aggressive tone, posture and declarative nature on the basis of her gender, because she was a female; (ii) the investigation would have been completely different if she was a male; (iii) the complaints against her were "absolutely the result of retaliation against me by the employee making the complaint" who only made the complaints after he announced his intent to resign; (iv) the investigation was biased and made her feel that her career was being threatened, (v) Kohl's should conduct a "third party review of the investigation" into her because it was inconsistent with Kohl's core values and ethical business practices; (vi) she was suspended based solely on LP Ollie's unsupported allegations without interviewing any other witnesses; and, (vii) as a result of the improper investigation and LP Ollie's harassment of her, she felt an "insurmountable amount of anxiety and stress." Diana received no response to her email.

g. Complaining to Kohl's CEO, and other members of Kohl's human resources department, via email dated February 16, 2021, that the same male loss prevention associate, LP Ollie, entered her office on November 9, 2020 and exploded on her, "scaring [her] so bad [she] thought he was going to hit [her]." Again, Diana received no response.

h. Complaining to Kohl's human resource department, via email dated February 19, 2021, about the problems with Kohl's investigation of her alleged harassment of LP Ollie and her unanswered complaints to numerous supervisors and managers at Kohl's about LP Ollie's harassment and retaliation against her.

126.    Diana suffered adverse employment actions when Kohl's suspended her employment from February 15, 2021 until February 24, 2021 and when Kohl's terminated her employment on May 12, 2012.

127.    There is a causal connection between Diana's protected activities and the adverse employment actions, which Kohl's took within months after Diana began to complain about gender discrimination and retaliation at Kohl's.

128.    Just one month after Diana complained to HR about LP Ollie's harassment of her, Kohl's suspended Diana's employment, without a proper investigation, when the same male employee, LP Ollie, retaliated against Diana by accusing her of harassing him after he announced his intent to resign.

129.    Just three months after Diana emailed the CEO to notify her about various unlawful employment practices taken against her, Kohl's terminated her employment.

130.    There is also a causal connection because Kohl's engaged in disparate treatment of Diana on the basis of her gender.

131.    When Diana complained that a male loss prevention associate, LP Ollie, was harassing her and other female employees, Kohl's conducted no investigation and did not punish the male harasser, notwithstanding the fact that Diana made multiple complaints to her supervisor, to LP Ollie's supervisor, to Kohl's human resources and AR, and to Kohl's CEO, which were supported by other female employees.

132.    In contrast, when the same male loss prevention associate, LP Ollie, retaliated against Diana by complaining, after he announced that he was resigning, that she harassed him and ignored him, Kohl's immediately conducted an accusatory investigation, without speaking to any witnesses, and punished Diana by suspending her employment.

133.    The two employees, Diana and LP Ollie, complained about the same exact conduct, but Kohl's treated a spurious and vague complaint from a male employee completely differently, and much more seriously, than it treated multiple, detailed and corroborated complaints from a female employee.  Kohl's treated the unsupported complaint from a male employee much more seriously than it treated a complaint from Diana, even though other female employees also complained about LP Ollie's harassment and, notwithstanding the facts that LP Ollie only made his complaint *after* Diana repeatedly reported his harassment to Kohl's and *after* LP Ollie announced his intent to resign.  Moreover, Kohl's investigated Diana for ignoring LP Ollie and punished her for that, even though Diana's supervisor and LP Ollie's supervisor both instructed her to avoid interacting with LP Ollie.

134.    The only explanation for Kohl's disparate treatment is that it was retaliating against Diana on the basis of her gender.

135.    As a direct and proximate result of Kohl's retaliatory employment actions, Diana has suffered damages for which she seeks compensation.

**COUNT IV**
**Hostile Work Environment - Vermont FEPA**
**(21 V.S.A. §§ 495 *et seq.*)**

136.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint, as if fully set forth herein.

137.    Diana complained to Kohl's, on multiple occasions, about LP Ollie's sexual harassment of her, and other female employees, that made them feel unsafe and uncomfortable.

138.    Although Kohl's received Diana's multiple complaints about LP Ollie's sexual harassment, Kohl's never conducted a proper investigation or sufficiently disciplined LP Ollie.

139.    Diana subsequently complained to Kohl's, on multiple occasions, about AR VP Bellassai and DLPM Rodi's discriminatory investigation into her, which she explained would have been completely different if she were a male.

140.    Although Kohl's received Diana's multiple complaints about AR VP Bellassai and DLPM Rodi's gender-based discrimination and retaliation against her, Kohl's never conducted an investigation or disciplined them.

141.    As set forth above, LP Ollie's consistent sexual harassment caused Diana and others to feel physically threatened at work.

142.    The hostile work environment created by Kohl's unreasonably interfered with Diana's work performance by causing her significant amounts of stress and anxiety.

143.    Kohl's misconduct was objectively and subjectively pervasive because there were numerous instances of misconduct over a seven month period.

144.    Kohl's misconduct was objectively and subjectively severe because the misconduct included, but was not limited to: a male employee using store cameras to spy on a female employee, a 6'5 male employee losing his temper and yelling at a female employee alone in a small office that made the female employee feel physically threatened, and Kohl's decision to investigate bias and spurious complaints from male employees, while ignoring complaints from female employees.

145.    As a direct and proximate result of Kohl's hostile work environment, Diana has suffered damages for which she seeks compensation.

## COUNT V:
### Retaliation and Discrimination - Vermont Parental and Family Leave Act
### (21 V.S.A. §§ 470 *et seq.* and 21 V.S.A. §§ 495 *et seq.*)

146.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

147.    Kohl's is an "employer" as defined under the Vermont PFLA, 21 V.S.A. § 471(1), because it is an organization doing business in or operating within this State and employs 15 or more individuals for an average of at least 30 hours per week during a year.

148.    Diana was an "employee" as defined under 21 V.S.A. § 471(2) because she worked at Kohl's for more than one year and averaged more than 30 hours per week.

149.    Pursuant to 21 V.S.A. § 472(a)(2), Diana was entitled to family leave under the Vermont PFLA.

150.    Pursuant to 21 V.S.A. § 472(e), Diana provided adequate notice of her need for medical leave by giving notice as soon as she became aware of the need for leave and as soon as was practicable.

151.    On April 13, 2021, Diana's physician sent Kohl's a "Concurrent Disability and Leave Statement of Incapacity" form, informing Kohl's that Diana had a disability and would be incapacitated between April 10, 2021 and April 26, 2021 and that Diana was "not cleared to return to work and [was] unable to do any work due to [abdominal] pain, diarrhea, and fatigue" because she was diagnosed with a Cryptosporidium infection.

152.    Diana requested and Kohl's granted her FMLA/PFLA leave from April 6, 2021 until April 25, 2021.

153.   At all relevant times, Diana was qualified and was satisfactorily performing her job as a Store Manager at Kohl's, as set forth in the positive Annual Performance Reviews that Kohl's provided her.

154.   Diana suffered an adverse employment action when Kohl's terminated her employment on May 12, 2021, immediately after she returned to work from a doctor's appointment that Diana scheduled and informed DM Southey about, which Diana scheduled because her disability and the serious health condition that required her to take FMLA/PFLA leave were getting worse.

155.   Kohl's termination of Diana's employment occurred under circumstances giving rise to discriminatory intent, which include, but are not limited to the fact that Kohl's terminated Diana's employment just 16 days after she returned from FMLA/PFLA leave and immediately after she returned from a doctor's appointment that she scheduled because her disability and serious health condition were getting worse.

156.   As a direct and proximate result of Kohl's PFLA retaliation and discrimination, Diana has incurred damages consisting of, but not limited to, loss of employment, lost wages and benefits, past and future, back pay, front pay, pain and suffering, mental anguish, loss of capacity for the enjoyment of life, reasonable attorneys' fees and costs, and other economic damages due to the loss of her job.

157.   Kohl's willfully violated the PFLA by terminating Diana's employment on May 12, 2012, after she returned from the doctor, in retaliation for her taking protected FMLA/PFLA leave for the same serious health condition/disability.

## COUNT VI:
### Disability Discrimination - Vermont FEPA
### (21 V.S.A. §§ 495, *et seq.*)

158.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

159.    Pursuant to 21 V.S.A. § 495d(1), Kohl's is subject to the Vermont FEPA because Kohl's is an organization doing business in or operating within Vermont.

160.    Pursuant to 21 V.S.A. § 495d(5), Diana is an "[i]ndividual with a disability" as that term is defined under the Vermont FEPA because her serious health condition, identified in the April 13, 2021 "Concurrent Disability and Leave Statement of Incapacity" form that her physician sent to Kohl's, was a physical or mental impairment that substantially limited one or more major life activity, Diana had a record of such an impairment, and Kohl's regarded Diana as having such an impairment.

161.    Pursuant to 21 V.S.A. § 495d(8), Diana's serious health condition substantially limited her ability to concentrate, think, and work and impaired the operation of major bodily functions, including but not limited to, digestive, bowel and bladder functions.

162.    Pursuant to 21 V.S.A. § 495d(6), Diana is a "qualified individual with a disability" under FEPA, because she could perform the essential functions of her Store Manager position at Kohl's, with or without reasonable accommodation.

163.    Diana suffered an adverse employment action when Kohl's terminated her employment shortly after she returned from FMLA/PFLA leave on May 12, 2021.

164.    Kohl's termination of Diana occurred under circumstances that give rise to an inference of discrimination based on her disability, namely the incredibly brief temporal proximity

– just 16 days - between her return from FMLA/PFLA leave for her disability/serious health condition and her termination.

165.    Kohl's had notice of Diana's disability because Diana informed her supervisor that her serious health condition was not improving and was getting worse after she returned from FMLA/PFLA leave and because Kohl's received an April 13, 2021 "Concurrent Disability and Leave Statement of Incapacity" form from Diana's physician identifying her diagnosed disability.

166.    Notwithstanding Kohl's knowledge of Diana's disability, Kohl's failed to consider any reasonable accommodations for Diana's disability, which led to her discharge for alleged behavioral issues caused by her disability.

167.    Kohl's could have accommodated Diana by granting her intermittent leave when her disability impacted her ability to perform the essential functions of her position.

168.    As a direct and proximate result of Kohl's discrimination due to her disability, Diana has suffered damages for which she seeks compensation.

**COUNT VII**
**Disability Retaliation - Vermont FEPA**
**(21 V.S.A. § 495(a)(8))**

169.    Diana incorporates by reference the allegations set forth in the preceding paragraphs of the Complaint as if fully set forth herein.

170.    Diana engaged in a protected activity under the Vermont FEPA because she requested FMLA/PFLA leave related to her disability that impaired her major life activity of working, which was tantamount to requesting an accommodation for disability. *See Bernheim v. New York City Dep't of Edu.*, 2021 WL 2619706, at * 11 (S.D.N.Y. June 25, 2021).

171.    Kohl's was aware that Diana engaged in a protected activity under the Vermont FEPA because it granted her FMLA/PFLA leave for her disability.

172.    Diana suffered an adverse employment action when Kohl's terminated her employment, just 16 days after she returned from FLMA/PFLA leave, and immediately after she returned to work from a doctor's appointment related to her disability.

173.    There is a causal connection between Diana's protected activity and her termination because her protected activity, taking FMLA/PFLA leave for her disability, was followed closely by her discriminatory termination.

174.    There is also a causal connection between Diana's protected activity and her termination because Kohl's terminated her employment because of her purported "ongoing pattern of unacceptable behavior", notwithstanding the fact that just two months earlier, DM Southey, Diana's direct supervisor, stated that Diana's behavior consistently exceeded Kohl's expectations for a Store Manager in Diana's 2020 Annual Performance Review.   Moreover, Kohl's never identified provided any details about when or how her behavior was unacceptable.

175.    As a result, the discrepancy between Kohl's stated reason for terminating Diana's employment and her 2020 Annual Performance Review, together with Kohl's failure to specifically identify any of Diana's problematic behaviors, lead to the conclusion that Kohl's stated reason for terminating Diana's employment was pretextual.

176.    As a direct and proximate result of Kohl's retaliatory employment actions, including but not limited to terminating Diana's employment, Diana has suffered damages for which she seeks compensation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court provide her with the following relief:

A.      Award Plaintiff damages in the form of past and future pecuniary losses resulting from Kohl's unlawful termination of her employment, including but not limited to appropriate back-pay, lost benefits provided by Kohl's during her employment, job search expenses, and front-pay, all with prejudgment interest in amounts to be determined at trial;

B.      Award Plaintiff damages to compensate her for past and future nonpecuniary losses resulting from Kohl's unlawful termination and employment practices, including but not limited to emotional and physical pain, suffering and inconvenience, in amounts to be determined at trial;

C.      Order Kohl's to pay Plaintiff punitive damages in amounts to be determined at trial;

D.      Award Plaintiff her reasonable attorney's fees and costs, including expert fees, incurred in pursuing this action pursuant to 21 V.S.A. § 495b(b); and

E.      Grant such further and additional relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all counts so triable.


Dated at Burlington, Vermont this 18th day of October, 2021.

PRIMMER PIPER EGGLESTON & CRAMER PC

By:    */s/ Gary L. Franklin*
        Gary L. Franklin, Esq.
        Jeremy S. Grant, Esq.
        30 Main Street, Suite 500
        P.O. Box 1489
        Burlington, VT 05402-1489
        (802) 864-0880
        gfranklin@primmer.com
        jgrant@primmer.com

# STATE OF VERMONT

**SUPERIOR COURT** _____ _____ **DIVISION**
**Unit** **Docket No.:** _____

| *Plaintiff(s)* | **VS.** | *Defendant(s)* |
|---|---|---|

## NOTICE OF APPEARANCE
### For Self-Represented Litigant

I am the:  ☐ Plaintiff  ☐ Defendant  in this case.

I will represent myself and, in addition to filing the required answer, I hereby enter my appearance with the court.  If I decide to be represented by an attorney in the future, either my attorney or I will notify the court of the change.

In representing myself, I understand that I **MUST**:

**1. Notify the court in writing of any changes in my address, phone number, or email address.**
**2. Give or send copies of any papers I file with the court to every other party in this case. If another party has an attorney, I will give or send copies to that party's attorney.**
**3. File a certificate of service with the court swearing that I have sent the papers I am filing to all parties. I understand that I can find that form on the Vermont Judiciary website or at the court house.**

**All court papers may be mailed to me by first class mail at the address listed below.**

| My Street Address | | | My Mailing Address (if different) | | |
|---|---|---|---|---|---|
| *Name* | | | *Name* | | |
| *Address* | | | *Address* | | |
| *Town/City* | *State* | *Zip* | *Town/City* | *State* | *Zip* |
| *Phone Number (day)* | | | *Phone Number (day)* | | |
| *Email Address* | | | *Email Address* | | |

*Dated* _____  *Signature* _____

*Printed Name* _____

October 19, 2021